UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SANJAY SEHGAL, MASSAPEQUA FAST FOOD LLC, HUNTINGTON FAST FOOD LLC, EAST NORTHPORT FAST FOOD LLC and LEVITTOWN FAST FOOD LLC,

**Plaintiffs**,

- against -

RAMAN AGGARWAL and MERIAM ENTERPRISE LLC,

**Defendants**.

Case No. _____

---

## COMPLAINT

Plaintiffs SANJAY SEHGAL, MASSAPEQUA FAST FOOD LLC, HUNTINGTON FAST FOOD LLC, EAST NORTHPORT FAST FOOD LLC, and LEVITTOWN FAST FOOD LLC, by and through their attorneys THE YITZHAK LAW GROUP, as and for their complaint against Defendants RAMAN AGGARWAL and MERIAM ENTERPRISE LLC herein allege upon information and belief as follows:

## PRELIMINARY STATEMENT

1.  Plaintiffs bring this action based on Defendants' violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO") that substantially injured Plaintiffs.

2.  Plaintiffs also bring causes of action under New York state law for theft of proprietary information and slander per se.

1

**PARTIES**

2. Plaintiff Sanjay Sehgal ("Sehgal") is a natural person who resides at 20 Greybarn Lane, Apt. 403, Amityville, New York 11701 and is a resident of the State of New York.

3. Plaintiffs Massapequa Fast Food LLC, Huntington Fast Food LLC, East Northport Fast Food LLC, and Levittown Fast Food LLC are New York limited liability companies operated by Sehgal (collectively, the "Business Entity Plaintiffs").

4. Defendant Raman Aggarwal ("Aggarwal") is a natural person who resides at 114 Long Drive Ct., Dix Hills, NY 11746 and is a resident of the State of New York.

5. Aggarwal is the former assistant managing member and former vice president of Kedis Enterprises LLC ("Kedis"), a New York limited liability company. Sanjiv Chand ("Chand") controls 60% of Kedis and is managing member and president.

6. Defendant Meriam Enterprise LLC ("Meriam") is a New York limited liability company with its principal place of business at 114 Long Drive Ct., Dix Hills, NY 11746 Aggarwal is a 77.43% member of Meriam, and Meriam is a 40% member of Kedis.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction over Plaintiff's RICO claim as a federal question under 28 U.S.C. § 1331 because the claim arises under the laws of the United States, including 18 U.S.C. § 1964(c).

8. This Court has supplemental jurisdiction over Plaintiffs' state law claims for theft of proprietary information and slander per se under 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy under Article III of the U.S. Constitution.

9. This Court has personal jurisdiction over the parties to this action because Defendants have purposefully availed themselves of the privilege of conducting activities within the forum state of New York, thus invoking the benefits and protections of its laws.

10. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391 because a) Defendants are all residents of New York; and b) a substantial part of the events or omissions giving rise to the claims occurred in Nassau County, which is in the Eastern District of New York.

## FACTS

11. During the time the facts occurred that gave rise to this Complaint, Aggarwal, as former assistant managing member and former vice president of Kedis, still had access to Kedis's premises and offices.

12. In November 2019, Sehgal, on behalf of the Business Entity Plaintiffs, began negotiating with Laura Maier and her father Neil White on behalf of Huntington Treat Company, LLC, ICQLI LLC, The Levittown Treat Company, LLC, and The East Northport Treat Company, LLC (together, the "Sellers") to purchase four Dairy Queen ("DQ") stores on Long Island, New York. The deal was to include valuable franchise agreements, leases, and employment contracts (the "DQ Deal"). Sehgal desired to partner with Chand on this transaction due to his expertise and experience: Chand is currently managing member of Kedis, which owns over a dozen fast food locations on Long Island. Chand and Kedis's offices are located at 1414 Hillside Ave., New Hyde Park, NY 11040. Sehgal sought Chand's advice on the DQ Deal.

13. The negotiation process naturally took months, and by May 2020, Plaintiffs had spent approximately between $60,000 and $70,000 to hire attorneys, secure environmental reports, pay appraisal fees, inspection fees, and bank and SBA fees, and pursue loans in order to

negotiate with Sellers a $4.5-million deal price in an asset purchase agreement (the "APA"). As such, Plaintiffs held a tangible expectancy of an opportunity to purchase four DQ stores and secure profits in the millions of dollars from the DQ Deal.

14. As part of the DQ Deal, Plaintiffs had signed a non-disclosure agreement ("NDA") with Sellers, which limited access to any documents received from Sellers to Sehgal and Chand. Neither Aggarwal nor Meriam had any part in the DQ Deal, which Sehgal had initiated and was arranging for the Plaintiffs.

15. Plaintiffs had also requested and received tax returns for 2017-2018 and profit and loss statements ("P&Ls") from 2017, 2018, 2019, and January – April 2020 for the four DQ stores. Along with the stores' tax returns and P&Ls, other confidential and proprietary documents belonging to Sehgal were associated with and included in the DQ Deal: financial and personnel information that went into the APA, tax returns, vendor lists and bills, employment agreements, property purchases, leases, and sales agreements (the "Deal Documents"). These were all in Plaintiffs' possession and located at the offices of Kedis, in Chand's office, in hard copy files and on a computer.

16. Sometime between May and July, while Plaintiffs were still negotiating the details of the DQ Deal with the Sellers, Aggarwal went to the offices of Kedis, entered Chand's office without consent, and stole both the hard copies and the computer containing the Deal Documents. Aggarwal did not have the right or privilege under any of the Deal Documents or the NDA to access, much less copy or take, these highly privileged and confidential documents from the Plaintiffs.

17. On or about July 22, 2020, Sehgal learned that Aggarwal, on behalf of himself and Defendant Meriam telephoned, texted, and met with Laura Maier and Neil White, and

4

showed them that he had the four stores' tax returns, P&Ls and Deal Documents. This infuriated Maier, as these confidential and highly sensitive documents had been given only to Plaintiffs under the NDA that allowed Chand and Sehgal to access them. Aggarwal also showed Maier and White his own bank statements in an effort to prove that *he* had funds available to pay for the DQs.

18. In fact, Aggarwal had stolen the Deal Documents and contacted and met with Maier and White in order to learn about the DQ Deal and to falsely tell them that Sehgal was inexperienced and had no money, that Aggarwal had the funds to complete deal, and that Sellers should do the deal with Defendants for $5 million, instead of with Plaintiffs for $4.5 million, with the intention to sabotage the DQ Deal.

19. As a result of Aggarwal's theft of the Deal Documents, which constitute trade secrets, and his communications and meeting with Sellers, which were part of Defendants' enterprise to steal, lie and take the DQ Deal from the Plaintiffs (the "Enterprise"), Sellers pulled out of the deal with Plaintiffs in August 2020, and Plaintiffs lost the lucrative $4.5-million DQ Deal including expected profits.

**FIRST CAUSE OF ACTION:
VIOLATION OF RICO 18 U.S.C. § 1962(c)**

20. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

21. Under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

22. Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to bring a private right of action for "a person injured in his business or property by reason of a violation of section 1962."

23. "In order to bring suit under § 1964(c), a plaintiff must plead (1) the defendant's violation of 18 U.S.C § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation." Kelco Construction, Inc. v. Spray in Place Solutions, LLC, 2019 WL 4467916, *5 (E.D.N.Y. Sept. 18, 2019) (citations omitted).

**A. Defendants Violated 18 U.S.C. § 1962**

24. Plaintiffs are natural persons and corporate entities, and are each thus "a person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

25. Defendants are a natural person and a corporate entity and are each thus "a person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

26. "'[E]nterprise' includes any individual, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Defendants' Enterprise meets RICO's definition of "enterprise" because Aggarwal is a 77.43% owner of Meriam, which is a legal entity. The Enterprise is an ongoing organization that functions as a continuing unit and was used as a tool to effectuate Defendant's pattern of racketeering activity, as detailed below.

27. The activities of the Enterprise affect interstate commerce because at least some of the activities of the Enterprise were conducted over electronic mail and by telephone. The activities of the Enterprise, including the unlawful sabotaging of Plaintiffs' DQ Deal, also affect interstate commerce because the Plaintiffs lost the opportunity to purchase and run the four restaurants involved in the DQ Deal, and restaurants operate within the stream of interstate commerce.

28.     Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), which includes theft of trade secrets under federal law (18 U.S.C. §§ 1961(1)(B)), wire fraud under federal law (18 U.S.C. § 1343), theft of proprietary information (trade secrets) under New York state law, and slander per se under New York state law.

29.     Under 18 U.S.C. § 1961(5), a "pattern of racketeering activity … requires at least two acts of racketeering activity" and the U.S. Supreme Court has held that the "pattern of racketeering activity" requirement means that "no more than two predicates would be necessary to establish a pattern of racketeering." H. J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 237, 109 S. Ct. 2893 (1989).

30.     Here, the "racketeering activity" includes Defendants' theft of the DQ Deal Documents, which include trade secrets, and thereby violated 18 U.S.C. § 1832, as well as Defendants' fraudulent use of telephone and text message to contact and meet with Maier and White, which violated 18 U.S.C. § 1343.

**(1) First Predicate: Theft of Trade Secrets**

31.     "Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly – (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information" commits a criminal offense indictable under 18 U.S.C. § 1832(a), which is a predicate offense under RICO. See 18 U.S.C. § 1961(1)(B).

7

32. Here, Aggarwal accessed and stole tax returns, profit and loss statements of Plaintiffs and other documents related to the DQ Deal.

33. This Court has found pricing information, including price quotes and proposals made to secure contracts that a plaintiff chose not to make publicly available, constitute trade secrets. *See, e.g.*, DeWitt Stern Grp., Inc. v. Eisenberg, No. 13 Civ. 3060, 2013 WL 2420835, at *4 (S.D.N.Y. June 4, 2013) ("Irreparable harm to an employer results through both the loss of client relationships and customer goodwill from a breach of a non-compete clause, and where an employee has misappropriated trade secrets or confidential customer information, including pricing methods, customer lists and customer preferences"); Devos, Ltd. v Record, 2015 WL 9593616, at * 10 (E.D.N.Y. December 24, 2015) (where defendants had access to material such as customer lists, prospective customer lists, referral sources, customer preferences, sales strategies, pricing and margin information, and other financial data that plaintiff chose not to make publicly available, plaintiff entitled to injunction based on allegation of theft of trade secrets).

**(2) Second Predicate: Wire Fraud**

34. "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice" commits a criminal offense indictable under 18 U.S.C. § 1343, which is a predicate offense under RICO. See 18 U.S.C. § 1961(1)(B).

8

35. Defendants devised and executed a scheme and artifice to defraud Plaintiffs by fraudulently representing to Maier and White, and thus to the Sellers, via telephone, text message, and in-person communications, that Plaintiffs were unfit financially and unable to consummate the DQ Deal, and by interfering with the contracted transaction.

36. On information and belief, Aggarwal met with and/or communicated with Maier and White on or about July 22, 2020 to discuss the DQ Deal.

37. Wire fraud encompasses communications sent via telephone (and text messages sent by telephone). *See, e.g.*, U.S. v. Abdallah, 840 F. Supp. 584, 609 (E.D.N.Y. 2012) (citing Fifth Circuit case of U.S. v. Hammond, 598 F.2d 1008, 1010 [5th Cir. 1979], which upheld wire fraud convictions based on telephone calls between the defendant and an FBI agent discussing plans for defrauding a brokerage house).

**B. Plaintiffs Suffered Injury**

38. Plaintiffs suffered injury to their business when the Sellers withdrew from the DQ Deal and returned Plaintiffs' escrow checks on August 6, 2020. The Sellers clearly stated that they were withdrawing from the DQ Deal because they were not comfortable moving forward with the DQ Deal after Aggarwal had accessed Sellers' confidential information, impugned Plaintiffs' financial situation, slandered Sehgal per se, and caused Sellers' resulting loss of confidence in Plaintiffs.

39. Plaintiffs thus lost a $4.5-million deal that was almost consummated and the related benefits of owning and operating profitable Dairy Queen franchise restaurants, which would have amounted to EBITDA of over $950,000 per year, because of Defendant's violations of 18 U.S.C. § 1962(c).

40. Plaintiffs also paid $60,000 to $70,000 out-of-pocket on costs to get the DQ Deal to its advanced stage with Sellers, all of which was lost when the Sellers pulled out of the DQ Deal due to Defendants' actions.

**C. Defendants' Violation of 18 U.S.C. § 1962(c) Caused Plaintiffs' Injury**

41. In order to satisfy the causation element of a civil RICO claim, the plaintiff must allege that the defendant's RICO violation was both the "but-for" and the proximate cause of his injury. Sky Medical Supply Inc. v. SCS Support Claims Services, Inc., 17 F. Supp. 3d 207, 234 (E.D.N.Y. 2014).

42. Defendants' RICO violation was the legal, or proximate, cause of Plaintiffs' injury because there is a direct relation between the injury to Plaintiffs' business – the loss of the DQ Deal – and the injurious conduct Defendants engaged in during their Enterprise – the contacting of Sellers, stealing of trade secrets and disclosure of confidential information, and slander per se. *See* Hemi Group, LLC v. City of New York, N.Y., 559 U.S. 1, 2 (2010). As this Court has held regarding the proximate cause requirement, a defendant is liable to those he has injured with his conduct where "his acts were 'a substantial factor in the sequence of responsible causation,' and whose injury was 'reasonably foreseeable or anticipated as a natural consequence.'" *Sky Medical*, 17 F. Supp. 3d at 234.

43. Aggarwal used his former position in Kedis and current ownership interest in Meriam to gain access to the confidential Deal Documents and then purposefully and directly use those documents to cause Sellers to doubt Plaintiffs and abandon the DQ Deal. Plaintiffs' loss of the DQ Deal was directly related to and caused by the actions of Defendants' Enterprise.

44. It was not only reasonably foreseeable but was actually anticipated and intended by Defendants that the actions of their Enterprise would result in the Plaintiffs' loss of the DQ

Deal: Aggarwal specifically contacted and met with Maier and White in order to dissuade the Sellers from completing the DQ Deal with Plaintiffs and to sabotage it. Defendants' scheme worked.

45. Defendants' RICO violation was also a logical, or "but for" cause of Plaintiffs' injury: But for Defendants' theft, fraud, bad faith and slander per se, Sellers would not have abandoned the DQ Deal with Plaintiffs. Maier told Sehgal that Sellers were uncomfortable proceeding with the DQ Deal, which occurred *because of the actions of Defendants*. In addition, but for Defendants' theft of the Deal Documents and their included trade secrets and proprietary information, Sellers would not have abandoned the DQ Deal. Maier told Sehgal that Sellers were distressed by the fact that Aggarwal had gained possession of their private, confidential paperwork from Plaintiffs and were not comfortable proceeding with the DQ Deal as a result of that distress and loss of confidence in Plaintiffs.

## SECOND CAUSE OF ACTION: MISAPPROPRIATION OF TRADE SECRETS

46. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

47. To establish a claim for misappropriation of trade secrets under New York state law, the plaintiff must show (1) that it possesses a trade secret, and (2) that defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means. Marsh USA, Inc. v. Alliant Ins. Services, Inc., 49 Misc.3d 1210(A), 2015 WL 6499525 at *4 (N.Y. Sup. Ct., Oct. 19, 2015) (citing Restatement of Torts § 757).

48. First, Plaintiffs possessed trade secrets that were included in the Deal Documents, including confidential and proprietary financial and personnel information that ended up in the loan applications, the APA, employment agreements, property purchases, and sales agreements.

49. A trade secret is defined under New York state law as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993) (citing Restatement of Torts § 757).

50. "Factors considered in evaluating claims of trade secrecy include: (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Marsh USA*, 2015 WL 6499525 at *4.

51. Here, the Deal Documents included Plaintiffs' compilations of information used in its business, including financial and personnel information that went into the APA. This information, if kept secret, would have given Plaintiffs the opportunity to consummate its negotiations with Sellers and continue its advantage over other potential buyers in negotiating the DQ Deal.

52. As for the factors in *Marsh*, they all indicate that the Deal Documents contained trade secrets: The information in the confidential Deal Documents was not known outside of the business of Kedis. Only Chand and Sehgal had access to DQ's financial information and the employment agreements, leases and other highly sensitive information included in the DQ Deal.

No other employees or others involved in the business were supposed to have access to the Deal Documents. Plaintiffs took measures to guard the secrecy of the information in the Deal Documents, including locking Chand's office, where they were located. The value of the information in the Deal Documents to Kedis and its competitors was great – if another franchisee knew how much Plaintiffs were willing to pay Sellers for the four DQs or the terms under which they were willing to purchase them (as revealed in the APA), or what they were willing to concede in employment agreements, competitors could undercut them in securing franchises. Plaintiffs took great effort and spent tens of thousands of dollars to develop the information. Finally, absent outright theft as committed by Defendants, it would have been quite difficult to acquire or duplicate the information in the Deal Documents because it would have required gaining access to Kedis's and the LLC Plaintiffs' books and records and other confidential information, none of which was publicly available.

53. Second, Defendants used Plaintiffs' trade secrets in breach of an agreement, confidence, or duty, or as a result of discovery by improper means. As stated above, Defendants had no right to access the Deal Documents. Aggarwal used his position both as former assistant managing member of Kedis and as controlling member of Meriam to access the Kedis premises and steal the Deal Documents from the Plaintiffs, which clearly constitutes "discovery by improper means."

### THIRD CAUSE OF ACTION: SLANDER PER SE

54. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

55. Spoken words are slanderous if they tend to expose the plaintiff to public hatred, contempt, ridicule or disgrace, and if they caused the plaintiff actual financial loss. However, statements that tend to discredit the plaintiff in his profession or business are actionable as slander per se, and the plaintiff need not allege special damages – they are presumed. *See* Nasca v. Sgro, 101 A.D.3d 963, 965 (N.Y. App. Div. 2012); Yammine v. DeVita, 43 A.D.3d 520, 521 (N.Y. App. Div. 2007); *see also* Gjonlekaj v. Sot, 308 A.D.2d 471 (N.Y. App. Div. 2003).

56. Sometime between May and July 2020, in the presence of Maier and White, who represented and controlled the Sellers in the DQ Deal, Defendant Aggarwal stated that "Sanjay has no money, no funds, and no standing," among other defamatory statements relating to the Plaintiffs' ability to successfully close the DQ Deal and operate the four DQ stores. Aggarwal also showed Maier and Her father the Deal Documents, disclosure of which was restricted by the NDA to Plaintiffs, thereby causing Maier and White to believe Sehgal and/or Chand had breached the NDA and lied to Maier and White about the confidentiality of the Deal Documents and the DQ Deal.

57. These defamatory statements discredited and imputed incompetence and dishonesty to Sehgal and Chand, specifically referring to a matter of significance and importance for the purposes of Plaintiffs' business and profession – the DQ Deal. The statements were reasonably susceptible of a defamatory meaning and did not constitute personal opinion: They reasonably appeared to contain assertions of objective fact – that Defendant Sehgal was financially unequipped to consummate the DQ Deal. *See* Kotowski v. Hadley, 38 A.D.3d 499, 500 (N.Y. App. Div. 2007); McCullough v. Certain Teed Products Corp., 70 A.D.2d 771, 771 (N.Y. App. Div. 1979).

58. Aggarwal's statements specifically referred to Sehgal and could also reasonably be understood to refer to his business, which included his business partner Chand and the Business Entity Plaintiffs that were involved in the DQ Deal. Plaintiffs are all private parties, and the Defendant's speech related to the DQ Deal, a matter of private concern. Thus, Plaintiffs are not required to prove falsity of Aggarwal's statements or fault on his part.

59. Plaintiffs were damaged in their business and profession when they lost the DQ Deal and its benefits solely because of Aggarwal's slanderous per se statements to Maier and White.

60. "[W]here the alleged slander is the sole cause of the target's injuries," the effects that the defendant's statements have on the plaintiff's reputation and standing in the community is to be considered when awarding damages. *Yammine*, 43 A.D.3d at 521.

61. Plaintiffs alleging slander per se are entitled to seek punitive damages where common-law malice can be shown. Marcus v. Bressler, 277 A.D.2d 108, 109-110 (N.Y. App. Div. 2000). Here, Aggarwal acted with both actual and common-law malice when he made the slanderous per se statements to Maier and White because he knew or recklessly disregarded whether his statements were false, and he made the statements with "personal spite, ill will, or culpable recklessness or negligence." Friedman v. Ergin, 110 A.D.2d 620, 621 (N.Y. App. Div. 1985); *see* Prozeralik v. Capital Cities Communications, Inc., 82 N.Y.2d 466, 479-480 (N.Y. 1993).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against Defendants:

    a. An order, pursuant to RICO, i) enjoining Defendants from engaging in the same type of endeavors alleged herein as related to the Enterprise; ii) providing to

15

Plaintiffs compensatory and treble damages and attorney's fees and costs, to be determined by this Court; and iii) providing that Defendants disgorge any and all ill-gotten gains from the Enterprise;

    b.    An order, pursuant to New York state law, enjoining Defendants from using the confidential information and trade secrets Defendants stole from Plaintiffs, and ordering them to return any property stolen from Plaintiffs, including but not limited to the computer and the Deal Documents;

    c.    An order, pursuant to New York state law, providing to Plaintiffs compensatory and punitive damages based on Aggarwal's malicious and reckless slander per se of Plaintiffs.

    d.    Such other and further relief as may be just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable of right by a jury.

Dated: Great Neck, NY
       September 25, 2020

                            **THE YITZHAK LAW GROUP**
                            Attorneys for Plaintiff

                            By: _____
                                Michele Marie Bowman

                            1 Linden Place, Suite 406
                            Great Neck, New York 11021
                            (516) 466-7144

## VERIFICATION

STATE OF NEW YORK )
) ss:
COUNTY OF NASSAU )

SANJAY SEHGAL, being duly sworn, deposes and states that he is a Plaintiff in the within action, and that the foregoing Complaint is true to his own knowledge, except as to matters therein stated to be alleged on information and belief, and as to those matters he believes them to be true.

_____
SANJAY SEHGAL

Sworn to before me this
25 day of September, 2020.

_____
Notary Public

JENINE A. SUMPTER
Notary Public, State of New York
No. 01SU6362994
Qualified in Queens County
Commission Expires August 14, 2021

18