UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
SANJAY SEHGAL; MASSAPEQUA FAST FOOD LLC;
HUNTINGTON FAST FOOD LLC;
EAST NORTHPORT FAST FOOD LLC; and
LEVITTOWN FAST FOOD LLC,

**FILED**
**CLERK**

3:26 pm, Aug 16, 2021

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

                         Plaintiffs,

        -against-

RAMAN AGGARWAL and MERIAM ENTERPRISE LLC,

                         Defendants.
---------------------------------------X

MEMORANDUM & ORDER
20-CV-4577(JS)(ARL)

APPEARANCES
For Plaintiffs:          Michele Marie Bowman, Esq.
                         The Yitzhak Law Group
                         1 Linden Place, Suite 406
                         Great Neck, New York 11021

For Defendants:          John H. Gionis, Esq.
                         Joshua Feldman, Esq.
                         Certilman Balin Adler & Hyman, LLP
                         90 Merrick Avenue
                         East Meadow, New York 11554

SEYBERT, District Judge:

        Plaintiff Sanjay Sehgal ("Sehgal") and several businesses operated by him (together with Sehgal, "Plaintiffs") commenced this action against Defendants Raman Aggarwal ("Aggarwal") and Meriam Enterprises LLC ("Meriam Enterprises," and together with Aggarwal, "Defendants") alleging a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 et seq., and claims under New York state law for theft of proprietary information and slander per se. Before the Court is Defendants' motion to dismiss Plaintiffs' Amended

Complaint in its entirety.  (Mot., ECF No. 22; Defs. Br., ECF No. 22-1; Reply, ECF No. 24.)  Plaintiffs oppose the motion.  (Pls. Opp., ECF No. 23.)  For the reasons set forth below, Defendants' motion is GRANTED.

BACKGROUND[1]

## I.   The Parties

Plaintiff Sehgal operates plaintiffs Massapequa Fast Food LLC, Huntington Fast Food LLC, East Northport Fast Food LLC, and Levittown Fast Food LLC.  (Amended Complaint ("Am. Compl."), ECF No. 17, ¶ 3.)  Defendant Aggarwal is the former assistant managing member and former vice president of non-party Kedis Enterprises LLC ("Kedis Enterprises") and is a 77.43 percent member of Defendant Meriam Enterprises.  (Id. ¶¶ 5, 6.)  Moreover, Meriam Enterprises owns 40 percent of Kedis Enterprises.  (Id. ¶ 6.)  Non-party Sanjiv Chand ("Chand") owns the remaining 60 percent of Kedis Enterprises and is the managing member and president.  (Id. ¶ 5.)

## II.  The Dairy Queen Deal

In November 2019, Plaintiffs began negotiating with Laura Maier ("Maier") and her father Neil White ("White"), on behalf of certain Sellers,[2] to purchase four Dairy Queen ("DQ")

---

[1] The following facts are taken from the Amended Complaint and presumed to be true for the purposes of this Memorandum & Order.

[2] The Sellers include Maier, White, Huntington Treat Company, LLC, ICQLI LLC, The Levittown Treat Company, LLC, and The East Northport Treat Company, LLC.

2

stores on Long Island, New York (the "DQ Deal").  (Id. ¶ 12.)
Plaintiff Sehgal partnered with Chand on the DQ Deal and sought
his advice.  (Id.)  The parties spent months negotiating an asset
purchase agreement that valued the DQ Deal at $4.5 million.  (Id.
¶ 13.)  By May 2020, Plaintiffs accrued between $60,000 and $70,000
in transaction-related costs.  (Id.)

    To further negotiations and the exchange of information,
the parties signed a non-disclosure agreement ("NDA") that limited
access to any documents received from Sellers to Sehgal and Chand.
(Id. ¶ 14.)  Pursuant to the NDA, Plaintiffs received tax returns
for the 2017 and 2018 tax years and profit and loss statements
from 2017 through 2020 for the four DQ stores.  (Id. ¶ 15.)  In
return, Plaintiffs provided Sellers with financial and personnel
information, including tax returns, vendor lists and bills,
employment agreements, property purchases, and leases and sales
agreements belonging to Plaintiff Sehgal (the "DQ Deal
Documents").  (Id.)  The DQ Deal Documents were all in Plaintiffs'
possession at the offices of Kedis Enterprises, in Chand's office,
in hard copy files, and on a computer.  (Id.)

    Neither Aggarwal nor Meriam Enterprises were involved in
the DQ Deal, notwithstanding Meriam Enterprises' ownership stake
in Kedis Enterprises.  (Id. ¶ 14.)  However, according to
Plaintiffs, Defendants sabotaged the DQ Deal.  On or about July
22, 2020, Sehgal learned that Aggarwal stole the DQ Deal Documents,

contacted and met with the Sellers, showed the Sellers that he was in possession of the DQ Deal Documents, and tried to convince the Sellers that he was financially better suited than Sehgal to complete the DQ Deal. (Id. ¶¶ 16-18.) "[I]nfuriated" that Plaintiffs were in apparent violation of the NDA, the Sellers pulled the plug on the DQ Deal. (Id. ¶¶ 17, 19.)

III. Procedural History

Plaintiffs initiated this action on September 25, 2020, shortly after the DQ Deal fell through. (Compl., ECF No. 1.) Plaintiffs filed the operative Amended Complaint on January 29, 2021, alleging claims under RICO and New York state law for theft of proprietary information and slander per se. (Am. Compl. ¶ 2.) As for their RICO claim, Plaintiffs assert that Aggarwal and Meriam Enterprises are an "enterprise" that engaged in "a pattern of racketeering activity" by stealing the DQ Deal Documents, the first predicate act, and fraudulently using telecommunications to contact and meet with the Sellers, the second predicate act. (Id. ¶¶ 26, 31-32, 34-35.) As a result, Plaintiffs were damaged because they (1) lost out on a $4.5 million deal that would have amounted to EBITDA of over $950,000 per year and (2) spent $60,000 to $70,000 in out-of-pocket costs during negotiations. (Id. ¶¶ 39-40.) Plaintiffs further assert that there is a "direct relation between the injury to Plaintiffs' business -- the loss of the DQ Deal -- and the injurious conduct Defendants engaged in during

their Enterprise -- the contacting of Sellers, stealing of trade secrets and disclosure of confidential information, and slander per se." (Id. ¶ 42.)

DISCUSSION

I.   Legal Standard

In deciding a Rule 12(b)(6) motion to dismiss, the Court applies a "plausibility standard," which is guided by "[t]wo working principles." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)); accord Harris v. Mills, 572 F.3d 66, 71-72 (2d Cir. 2009).   First, although the Court must accept all allegations as true, this "tenet" is "inapplicable to legal conclusions"; thus, "[t]hreadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678; accord Harris, 572 F.3d at 72.   Second, only complaints that state a "plausible claim for relief" can survive a Rule 12(b)(6) motion to dismiss.   Iqbal, 556 U.S. at 679.   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   Id. at 678.   Ultimately, this determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."   Id. at 679; accord Harris, 572 F.3d at 72.

II.  Analysis

    A.  The RICO Claim

        Defendants argue that Plaintiffs have failed to adequately plead a RICO claim.  The Court agrees.

        RICO was enacted to "prevent organized crime from infiltrating America's legitimate business organizations." Manley v. Doby, No. 12-CV-4835, 2012 WL 5866210, at *3 (E.D.N.Y. Nov. 19, 2012) (quoting Moccio v. Cablevision Sys. Corp., 208 F. Supp. 2d 361, 371 (E.D.N.Y. 2002)).  Congress did not intend for RICO's extreme remedies to preempt the remedies available through "garden-variety state common-law causes of action." Gross v. Waywell, 628 F. Supp. 2d 475, 488 (S.D.N.Y. 2009); see also Menasco, Inc. v. Wasserman, 886 F.2d 681, 683 (4th Cir. 1989) ("Congress contemplated that only a party engaging in widespread fraud would be subject to such serious consequences," i.e., treble damages).  The Act contains a criminal provision, see 18 U.S.C. § 1962, and a civil provision, see 18 U.S.C. § 1964.  The civil provision permits the recovery of treble damages and reasonable attorney's fees for any person who is "injured in his business or property by reason of a violation of" the criminal provision.  18 U.S.C. § 1964(c).  "Because the mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." Allstate Ins.

Co. v. Valley Physical Med. & Rehabilitation, P.C., No. 05-CV-
5934, 2009 WL 3245388, at *3 (E.D.N.Y. Sept. 30, 2009) (quoting
Bell v. Hubbert, No. 95-CV-10456, 2007 WL 60513, at *5 (S.D.N.Y.
Jan. 8, 2007)).

　　　　　To establish a civil RICO claim, "a plaintiff must show:
'(1) a violation of the [criminal] RICO statute, 18 U.S.C. § 1962;
(2) an injury to business or property; and (3) that the injury was
caused by the violation of Section 1962.'" DeFalco v. Bernas, 244
F.3d 286, 305 (2d Cir. 2001) (quoting Pinnacle Consultants, Ltd.
v. Leucadia Nat'l Corp., 101 F.3d 900, 904 (2d Cir. 1996)).  To
satisfy the first element, the plaintiff must allege the following
"seven constituent elements: (1) that the defendant (2) through
the commission of two or more acts (3) constituting a 'pattern'
(4) of 'racketeering activity' (5) directly or indirectly invests
in, or maintains an interest in, or participates in (6) an
'enterprise' (7) the activities of which affect interstate or
foreign commerce." Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17
(2d Cir. 1983) (quoting 18 U.S.C. § 1962(a)-(c)).

　　　　　1.　 RICO Enterprise Affecting Interstate Commerce

　　　　　The Court first finds that Plaintiffs allege an
enterprise affecting interstate commerce.  An "enterprise" is
defined under RICO to include "any individual, partnership,
corporation, association, or other legal entity, and any union or
group of individuals associated in fact although not a legal

entity."  18 U.S.C. § 1961(4).  Accordingly, the Second Circuit has held that under Section 1961 "any legal entity may qualify as a RICO enterprise." <u>First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.</u>, 385 F.3d 159, 173 (2d Cir. 2004).  Plaintiffs have adequately pleaded the RICO enterprise requirement because they allege that Meriam Enterprises is a limited liability company, which Aggarwal used to commit the predicate acts.  (Am. Compl. ¶¶ 6, 26, 43); <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158, 164-65 (2001) (holding RICO's enterprise requirement is satisfied where a corporate employee unlawfully conducts the affairs of the corporation through a RICO pattern of activity).

However, the activities of the enterprise must also affect interstate or foreign commerce. <u>Moss</u>, 719 F.2d at 17.  To satisfy this element "a plaintiff must allege that defendants' RICO enterprise had at least 'a "minimal effect"' on interstate (or foreign) commerce." <u>Wolhendler v. Goldberg</u>, No. 19-CV-0457, 2020 WL 5658790, at *1, 7 (E.D.N.Y. Sept. 23, 2020) (quoting <u>DeFalco</u>, 244 F.3d at 309).  Recognizing the low threshold, the Second Circuit has stated that "the impact need not be great . . . [s]o long as the activities of the enterprise affect interstate commerce, the jurisdictional element is satisfied." <u>United States v. Barton</u>, 647 F.2d 224, 233 (2d Cir. 1981); <u>see also</u> <u>Santana v. Adler</u>, No. 17-CV-6147, 2018 WL 2172699, at *8 (S.D.N.Y. Mar. 26, 2018) ("[T]he law in this Circuit does not require RICO plaintiffs

to show more than a minimal effect on interstate commerce."); Allstate Ins. Co. v. Yehudian, No. 14-CV-4826, 2018 WL 1767873, at *13 (E.D.N.Y. Feb. 15, 2018) ("RICO plaintiffs need only show 'a minimal effect on interstate commerce.'").

Here, Plaintiffs have satisfied this minimal requirement. Generally, "[w]here all parties are New York residents, all telephone calls are presumed to be intrastate . . . absent any indication otherwise." McCoy v. Goldberg, 748 F. Supp. 146, 154 (S.D.N.Y. 1990). But here, it is plausible for the Court to infer that some form of interstate communication and travel was required for Aggarwal to carry out his scheme. Indeed, Plaintiffs claim that White lives in New Jersey (Am. Compl. ¶ 27), that Defendant Aggarwal resides in New York (id. ¶ 4), and that Defendant Meriam is a New York LLC with its principal place of business in New York (id. ¶ 6). Thus, in order for the alleged meeting between Maier, White, and Aggarwal to have occurred, "some of the activities of the Enterprise were conducted over electronic mail and by telephone." (Id. ¶ 27.)

Courts in this Circuit have concluded that the use of interstate communication, such as the United States Postal Service, to effectuate a fraudulent scheme can satisfy the interstate commerce requirement. See Cadle, Co. v. Flanagan, 271 F. Supp. 2d 379, 389-90 (D. Conn. 2003); see also Aliev v. Borukhov, No. 15-CV-6113, 2016 WL 3746562, at *12 (E.D.N.Y. July

8, 2016) (noting "[s]ome courts in this circuit have suggested that the use of mails, an instrumentality of interstate commerce, could be sufficient to meet the low threshold"). This finding is further bolstered where the interstate communication "adversely affect[s] plaintiffs' business which is involved with and operates in interstate commerce." Cadle, Co., 271 F. Supp. 2d at 390. At this stage, drawing all reasonable inferences in favor of the Plaintiffs, the allegations of a meeting between Aggarwal, Maier, and White (and their residences), and that the interstate communications caused Plaintiffs to lose the opportunity to purchase four DQ restaurants that "operate within the stream of interstate commerce," is enough to satisfy the minimal interstate commerce requirement. (Am. Compl. ¶ 27); see Cadle, Co., 271 F. Supp. 2d at 390 (finding the interstate commerce requirement satisfied through the use of the United States Postal Service in furtherance of a scheme that adversely affected the plaintiff's business, which operated in interstate commerce); see also DeFalco, 244 F.3d at 309 (finding that the plaintiff satisfied the interstate commerce requirement where, like here, "one of the extortionate demands [of a defendant] caused [the plaintiff] to break an $8800 contract with . . . an out-of-state" company).

Accordingly, the Court finds Plaintiffs have adequately pleaded an enterprise affecting interstate commerce.

2.  Pattern of Racketeering Activity

The Court next considers whether Plaintiffs plausibly allege a pattern of racketeering activity and finds that they have not. Under RICO's definitional section, a "pattern of racketeering activity' requires at least two [predicate] acts of racketeering activity, . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 183 (2d Cir. 2008) (ellipses in original) (quoting 18 U.S.C. § 1961(5)). "The acts of racketeering activity that constitute the pattern must be among the various criminal offenses listed in § 1961(1), and they must be 'related, and [either] amount to or pose a threat of continuing criminal activity.'" Id. (alteration in original) (quoting Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999)).

Plaintiffs may establish continuity through a showing of either "open-ended continuity" or "closed-ended continuity." Ferri v. Berokowitz, 678 F. Supp. 2d 66, 74 (E.D.N.Y. 2009). Open-ended continuity is shown by proving a "pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." Id. "Closed ended continuity is shown by proving 'a series of related predicate acts extending over a substantial period of time.'" Id. (quoting Cofacredit, S.A., 187 F.3d at 242). Regardless of the

theory, "[c]ourts have uniformly and consistently held that schemes involving a single, narrow purpose and one or few participants directed towards a single victim do not satisfy the RICO requirement of a closed or open pattern of continuity." Lefkowitz v. Bank of N.Y., No. 01-CV-6252, 2003 WL 22480049, at *8 (S.D.N.Y. Oct. 31, 2003), rev'd on other grounds, 528 F.3d 102 (2d Cir. 2007).

As alleged in the Amended Complaint, Defendants' scheme began "[s]ometime between May and July" 2020 and ended sometime around July 22, 2020, when the Sellers pulled out of the DQ Deal due to Aggarwal's interference.  (Am. Compl. ¶¶ 16-17, 19.)  A definitive end to the scheme, as exists here, forecloses a finding of open-ended continuity.  See Ozbakir v. Scotti, 764 F. Supp. 2d 556, 571 (W.D.N.Y. 2011) (allegations did not indicate open-ended continuity where scheme had a specific goal and, once goal was realized, scheme was over); Breslin Realty Dev. Corp. v. Schackner, 397 F. Supp. 2d 390, 404 (E.D.N.Y. 2005) (plaintiff failed to allege open-ended continuity because the scheme came to an abrupt halt).

As a result, Plaintiffs argue that the scheme at issue in this case satisfies closed-ended continuity.  (Pls. Opp. at 5-6, 11-12.)  However, this argument is without merit because courts in the Second Circuit have been clear that a period of less than two years does not constitute a "substantial period of time"

sufficient to establish a closed-ended scheme for RICO liability.
See Spool, 520 F.3d at 184 ("Although we have not viewed two years
as a bright-line requirement, it will be rare that conduct
persisting for a shorter period of time establishes closed-ended
continuity," especially where "'the activities alleged involved
only a handful of participants' and do not involve a 'complex,
multi-faceted conspiracy'" (citation omitted)); see also Ferri,
678 F. Supp. 2d at 76 ("[T]he Second Circuit has noted that a
period of at least two years of criminal activity is necessary to
support an allegation of closed-ended continuity.").  While the
Court may also consider the number and variety of predicate acts,
the number of people involved in the scheme, and the number of
schemes themselves, "the time period element is the most important
factor."  Ferri, 678 F. Supp. 2d at 76; see also Spool, 520 F.3d
at 184 ("closed-ended continuity is primarily a temporal concept"
(quoting Cofacredit, 187 F.3d at 242)).  As such, Plaintiffs'
allegations of, at most, a three-month scheme falls short and fails
to plausibly allege closed-ended continuity.  See Spool, 520 F.3d
at 184 (sixteen-month period insufficient to establish closed-
ended continuity); DeFalco, 244 F.3d at 322 (predicate acts over
a period of a year and a half did not satisfy closed-ended
continuity requirement).

Moreover, the remaining factors that the Court may
consider -- the number and variety of predicate acts, the number

13

of participants and victims, and the presence of separate schemes -- weigh against Plaintiffs.   The Amended Complaint alleges only one scheme; the scheme consisted of only two interrelated predicate acts -- the statutory minimum; the scheme affected only a small number of victims -- Plaintiffs and, perhaps, Chand; and the scheme had a narrow purpose -- to steal the DQ Deal.  (See generally Am. Compl.)   By contrast, schemes lasting less than two years can satisfy RICO's closed-ended continuity requirement where, for example, the defendants allegedly committed twenty-three predicate acts over an eight-and-one-half-month period in a "complex, multi-faceted conspiracy to defraud executed by numerous officers and stockholders."   Polycast Tech. Corp. v. Uniroyal, Inc., 728 F. Supp. 926, 948 (S.D.N.Y. 1989).   Thus, "even putting aside the issue of time, Plaintiffs have essentially alleged a single scheme to defraud" a small number of victims.   Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs., No. 09-CV-3855, 2013 WL 12368698, at *12 (E.D.N.Y. Feb. 19, 2013) (Seybert, J.).  As alleged, Defendants underhanded business maneuver, "egregious though it may be, does not sufficiently demonstrate a pattern of racketeering activity." Id. (citing First Cap. Asset Mgmt., Inc., 385 F.3d at 182).

Plaintiffs seek to remedy this pleading deficiency by contending that "Aggarwal used his former position in Kedis" as managing member and vice president, which terminated in 2013, and his position in Meriam Enterprises, which controls 40 percent of

Kedis Enterprises, to remain on the Kedis premises, which "eventually led to a deal he could steal." (Pls. Opp. at 11-12.) Thus, by Plaintiffs' timeline, Aggarwal's scheme, effectuated through Meriam Enterprises, existed for seven years. (Id.) These arguments are unavailing because Plaintiffs make no allegation regarding Aggarwal's supposed lurking about in search of a deal to steal in their Amended Complaint. (See generally Am. Compl.) And, it is well established that "Plaintiff cannot amend [his] pleadings through [his] briefs." Benson v. Ruttura & Sons Constr. Co. Inc., No. 20-CV-0853, 2021 WL 1238712, at *5 (E.D.N.Y. Mar. 31, 2021) (Seybert, J.) (quoting Tappin v. Metropolitan Suburban Bus Auth., No. 12-CV-2016, 2014 WL 1330649, at *5 (E.D.N.Y. Mar. 31, 2014)); Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 71 (2d Cir. 1998) (in deciding a motion to dismiss, the Court is confined to "the allegations contained within the four corners of [the] complaint.").

However, even considering these allegations, Plaintiffs' claims still fails. "RICO continuity is measured by RICO predicate acts, not by actions that, while wrongful, are not statutory predicates for a RICO violation." Vicon Fiber Optics Corp. v. Scrivo, 201 F. Supp. 2d 216, 221 (S.D.N.Y. 2002). Applied here, the first predicate act occurred -- at the earliest -- in May 2020 when Aggarwal entered Chand's office and allegedly stole the DQ Deal Documents, and the second predicate act occurred -- at the

latest -- in July 2020 when Aggarwal met with Maier and White to
surreptitiously steal the DQ Deal.  (Am. Compl. ¶¶ 16-17.)  Thus,
the proper measure of time for RICO continuity is three months at
most, not "[s]even years" as Plaintiffs claim.

Finally, the Court finds its conclusion that Plaintiffs
cannot satisfy the pattern requirement is consistent with the
purpose of RICO, i.e., to "advance society's fight against
organized crime." Shearson/American Express, Inc. v. McMahon, 482
U.S. 220, 241 (1987).  "[T]he Court doubts that Congress designed
RICO's draconian sanctions to reach a simple fraudulent scheme,
such as that asserted here, . . . to inflict or threaten relatively
limited injury only to the narrow and localized private interests
of a few victims." Gross, 628 F. Supp. 2d at 497.  RICO is not
intended as a tool to inflate the import of, or the damage award
applicable to, every garden variety fraud case.  Rather, "Congress
had a more natural and commonsense approach to RICO's pattern
element in mind, intending a more stringent requirement than proof
simply of two predicates, but also envisioning a concept of
sufficient breadth that it might encompass multiple predicates
within a single scheme that were related and that amounted to, or
threatened the likelihood of, continued criminal activity." H.J.
Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 237 (1989).
Accordingly, the pattern requirement has operated to design here,
"weed[ing] out" ordinary state law claims from those of a

sufficient criminal gravity to warrant federal concern and the specter of treble damages.  Ouannou v. Starr, No. 02-CV-5057, ECF No. 38 (E.D.N.Y. Sept. 16, 2003) (Seybert, J.); see also Gross, 628 F. Supp. 2d at 487.

Because Plaintiffs fail to plausibly allege the continuity requirement for a pattern of racketeering activity, the Court finds it unnecessary to address Defendants' remaining arguments regarding Plaintiffs' failure to allege each predicate act with specificity.  See Lefkowitz, 2003 WL 22480049, at *10 (dismissing RICO claim solely based on the plaintiff's failure to allege the pattern requirement); see also Sands Harbor Marina Corp., 2013 WL 12368698, at *12 (dismissing civil RICO action for failure to adequately plead pattern requirement); Spool v. World Child Int'l Adoption Agency, No. 06-CV-4243, 2006 WL 8449274, at *3 (S.D.N.Y. Oct. 5, 2005) (same), aff'd, 520 F.3d 178. Accordingly, Defendants' motion to dismiss Plaintiffs' RICO claim is GRANTED and Plaintiffs' RICO claim is DISMISSED.

B.   State Law Claims

"A federal court has the power to hear state law claims under the doctrine of pendent jurisdiction if the state and federal claims derive from a 'common nucleus of operative fact' such that the plaintiff ordinarily would be expected to try them all in one judicial proceeding." Drummer v. DCI Contracting Corp., 772 F. Supp. 821, 831 (S.D.N.Y. 1991).  Whether to exercise pendent

jurisdiction is within the Court's discretion, though the Court may consider factors such as judicial economy, convenience, and fairness. St. Louis v. N.Y.C. Health and Hosp. Corp., 682 F. Supp. 2d 216, 238 (E.D.N.Y. 2010). "[W]hen all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice." Tops Marks, Inc. v. Quality Markets, Inc., 142 F.3d 90, 103 (2d Cir. 1998) (emphasis omitted).

Since this case is in its infancy, and Plaintiffs' RICO claim, the only federal cause of action, is dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state law claims, which are DISMISSED WITHOUT PREJUDICE to being refiled in state court. Dole v. Huntington Union Free Sch. Dist., No. 14-CV-1283, 2016 WL 4703658, at *7 (E.D.N.Y. Sept. 8, 2016), aff'd, 699 F. App'x 85 (2d Cir. 2017).

C.   Leave to Amend

Last, Plaintiffs seek leave to file a second amended complaint. (Pls. Opp. at 17.) Although "leave [to amend] shall be freely given as justice so requires," the Court finds that any further amendments would be futile. FED. R. CIV. PRO. 15(a). At the parties' pre-motion conference, the Court raised concerns regarding the viability of Plaintiffs' RICO claim, and specifically their ability to establish the pattern requirement.

After the conference, Plaintiffs filed the Amended Complaint but, as discussed above, failed to plausibly allege a pattern of racketeering activity.  Thus, Plaintiffs' request to file a second amended complaint is DENIED.

CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (ECF No. 22) is GRANTED, and Plaintiffs' RICO claim is DISMISSED.  The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims, which are DISMISSED WITHOUT PREJUDICE to being refiled in state court.  The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     August  16 , 2021
           Central Islip, New York